**DISTILLERS DISTRIBUTING CORP. v. SHERWOOD DISTILLING CO.**

No. 6267.

United States Court of Appeals
Fourth Circuit.

Argued June 26, 1951.

Decided August 7, 1951.

Morris Rosenberg, Baltimore, Md., for appellant.

Wilson K. Barnes, Baltimore, Md. (William Hoffenberg and Anderson & Barnes, all of Baltimore, Md., on brief), for appellee.

Before PARKER, Chief Judge, DOBIE, Circuit Judge, and TIMMERMAN, District Judge.

PARKER, Chief Judge.

This is the second appeal in an action for breach of warranty against excess "outage", or deficiency in content, made in connection with a sale of neutral grain spirits in barrels. On the first trial of the case, the trial judge held that the language relied on did not amount to a warranty because not used when the sale was closed but in the prior negotiations and, without passing on the meaning of the language relied on as a warranty or determining other questions in the case, entered judgment for defendant. On the prior appeal, we held this to be error and remanded the case for further proceedings. Distillers Distributing Corp. v. Sherwood Distilling Co., 4 Cir., 180 F.2d 800. On the second trial, which was had without a jury, the judge held that the language relied on did not amount to a warranty against excess outage and entered judgment for defendant, from which plaintiff brings this appeal.

As we pointed out in our former opinion, it is necessary to bear in mind that, under the revenue laws of the United States, when distilled spirits are manufactured they may be placed in a warehouse without payment of the excise tax imposed on manufacture, if a bond be given that the tax will be paid when they are withdrawn. In such case, the tax follows the ownership

of the spirits and must be paid by him who is the owner at the time of withdrawal. The spirits are gauged when placed under bond and also at the time of withdrawal; and the tax of $9 per gallon must be paid, not only on the spirits in the containers at the time of withdrawal, but also on any deficiency then appearing in excess of the standard amount determined pursuant to regulation under what is known as the "Carlyle formula".

The outage allowed under the "Carlyle formula" is based on long experience as to the maximum outage to be expected from ordinary leakage and evaporation, the thought being that, if the outage is less than the maximum, no harm will result as the tax will be paid on the spirits found to be in the containers in any event. In this case the spirits were purchased by plaintiff for export to Canada and, because they were withdrawn from the warehouse for export, no tax was payable on the spirits found in the containers upon their being regauged; but the tax of $9 per gallon was payable on any "outage" in excess of that permitted by the "Carlyle formula".

The facts with respect to the warranty are as follows: The defendant, the Sherwood Distilling Co., had something in excess of 1200 barrels of spirits in warehouse under bond which it desired to sell. In a telephone conversation on March 30, 1948, it authorized a broker to sell them, fixing a price of $1 per gallon and stating that they "were in very good cooperage and that the outage was very slight". In a letter to the broker the following day, describing the spirits and stating that samples were being sent, they were offered for sale subject to confirmation at $1 per gallon, and it was said that they were "in very good cooperage subject to being on hand". The broker, in a letter of April 2, 1948, offered them to plaintiff at the price of $1 per gallon, regauged at time of delivery, and stated, "I am also advised that the goods are in first class cooperage, and the loss through evaporation has been slight."

Plaintiff did not accept the offer at the price contained in the letter, but continued negotiations looking to the purchase of the spirits, and on April 14 a sale and purchase thereof was agreed upon at a price of 85 cents per gallon. No formal written contract covering the sale was signed, but the broker sent telegrams to the seller and buyer, confirmed by letters, setting forth the price and approximate quantity of the spirits and some other details such as the proof and the dates of barreling, but containing no warranty as to cooperage, or against excess outage. The buyer testified, however, that he relied upon the statements with regard to these matters contained in the letter of the broker as well as upon similar statements made by the broker verbally over the telephone and that he would not have purchased the spirits otherwise. There is evidence, also, that upon the seller's learning that there was excess outage in one 165 barrel lot of the spirits sold, he requested the broker to communicate this fact to the buyer and secure a waiver with regard thereto as a condition of sale.

When the spirits were regauged it was found that the outage, apart from that as to which a waiver had been obtained, was far in excess of what was allowed under the Carlyle formula; and plaintiff, as the owner of the spirits was required to pay $18,080.10 on account of excess outage discovered when the spirits were regauged by the defendant in accordance with the contract of sale.

The crucial language relied on as a warranty against excess outage is the language of the broker in his letter of April 2 in which he said, "I am also advised that the goods are in first class cooperage, and the loss through evaporation has been slight". There was testimony on the part of three witnesses of wide experience in the buying and selling of spirits, one of whom was the vice president and treasurer of plaintiff who made the purchase, one of whom was the broker who made the sale and the other was an independent broker of Philadelphia, that the meaning of this language, according to the usage and custom of the trade, was not merely that the containers of the spirits were in good condition but that the outage would not exceed that

permitted by the "Carlyle formula". This testimony was clear and unequivocal, not only as to the meaning attributed to the language by the usage and custom of the trade but also as to the reason and necessity for it. Mr. Friel, plaintiff's vice president and treasurer, testified:

"Q. What meaning has the expression 'The spirits are in first-class cooperage' with respect to outage? A. Well, it means that the outage will not be in excess of the outage permitted by the Bureau of Internal Revenue under the statutes governing the operation of the liquor industry. That is known as the Carlyle Allowance.

"Q. Is that what you mean by the meaning of the customary and usual meaning of the statement that the spirits are in first-class cooperage? A. Yes. It means that you would not suffer excess losses and be penalized by the loss of the excess spirits and also be penalized by having to pay the taxes on those spirits or whiskeys in excess of the Carlyle Allowance.

"Q. Is this meaning general throughout the distilled spirits industry, or is it a local customary meaning? A. Throughout the industry.

"Q. Is the usual and customary meaning given those words by the trade the same in Maryland, New York and New Jersey? A. Yes, sir.

\*     \*     \*     \*     \*     \*

"Q. Can you explain how and why this custom and usage arose? A. Yes, because a man, if he bought something, wanted to be sure that he was getting the merchandise that he paid for. The development has taken place that it was good, sound cooperage, that it wasn't a badly made barrel, that it wasn't made of green lumber or wood, whatever you want to call it, and he was not going to have the penalties of excess outage and the taxes that go with them.

"Q. How are the spirits in bulk usually bought? By that I wish you would direct your answer to whether you view the barrels physically or do not? A. If there was any question about the distiller and you could not get a statement that it was good, sound cooperage that you could rely on, why, you would go down and examine them, test-check them.

"Q. Do you mean by that that where the statement is made it eliminates the check? A. That is right.

"Q. The physical check? A. That is right."

The broker Metzger, who used the language, testified:

"Q. What is the customary or usual meaning attached to this statement in the trade? A. Whiskey in first-class cooperage, in good cooperage, very good cooperage, excellent cooperage, means, in my opinion, that it is in barrels which provide for proper aging and which permit tax payment of the whiskey within the government allowance. That means that when whiskey is tax paid, there should not be expected any outages in excess of the allowances stipulated by the Treasury Department.

"Q. You said whiskey. What about spirits? A. The same applies to spirits.

"Q. You said in your opinion. Is it your opinion or is it the custom and usage of the trade? A. That is the trade custom, in my opinion.

"Q. Is there any question about there being a trade custom. A. No, there is a trade custom.

"Q. Is this meaning general throughout the distilled spirits industry, or is it a local customary thing? A. It has a national meaning.

"Q. Is it the usual and customary meaning to those words in the trade in Maryland, New York and New Jersey? A. Yes, in any state.

\*     \*     \*     \*     \*     \*

"Q. How long has this custom and usage been in effect? A. So long as I can remember; during the time I am a whiskey broker, it always has been in effect, and I know, from hearsay and from people who have been longer in the business, from my partner, that this was the case also before my time.

"Q. Can you explain why the custom and usage arose, the purpose of it? A. It is very difficult to make a physical examination of barrels as to outages or as to their quality. Therefore, in many cases warranties are given that the whiskey is in good cooperage or very good cooperage or excellent cooperage, and that means that the whiskey tax pays properly, namely within the Government allowance."

The broker Laden testified:

"Q. In the distilled spirits industry, respecting the sale of distilled spirits in bulk, is there any customary or usual meaning attached to the statement that the goods are in 'first class cooperage' and 'the loss through evaporation has been slight'?

\* \* \* \* \* \*

"A. Yes there is.

"Q. What is the customary or usual meaning attached to that statement in the trade? A. A statement like that would mean that loss by evaporation is within the Government Carlyle table for tax payment, and that at the time the goods were tax paid there would be no excess loss above the allowance, and there would be no excess tax paid the Government.

"Q. Is that the meaning generally throughout the distilled spirits industry? A. Yes."

Against this positive testimony there was introduced by the defendant only the testimony of its president, which was not impressive, and that of a broker who, while denying that the warranty of first class cooperage had the meaning in the trade attributed to it by plaintiff's witnesses, said he did not know what meaning would customarily be given the whole of the language upon which plaintiff relies. We think that the clear weight of the evidence supports plaintiff's contention as to the customary meaning of the language used; and we do not think that it may be ignored merely because it is not supported by evidence of specific instances. See Wigmore on Evidence sec. 1954; 55 Am.Jur. pp 314–316.

Whether the testimony as to the usage and custom is sufficient of itself to establish a warranty against excess outage from the warranty as to first class cooperage, standing alone, it unquestionably furnishes a background in the light of which the entire language of the warranty relied on is to be interpreted; and the language used, it should be remembered, was not merely that the spirits offered for sale were in "first class cooperage", but also that the loss through evaporation had been slight. This language of the seller, relied upon by the buyer in purchasing the spirits offered, certainly amounted to a warranty that the containers were in first class condition, so that little leakage was to be expected, and that the loss through evaporation had been slight. Since the evidence showed that the outage permitted under the "Carlyle formula" was the maximum reasonably to be expected, this warranty necessarily means that the outage would not exceed that permitted by the formula. There is no contention that there was any "outage" due to theft, and defendant's president has testified that the outage was due to evaporation. Certainly a loss that is "slight" cannot in any possible use of language be construed to be in excess of the maximum reasonably to be expected under the usage and custom of the trade.

There can be no question, we think, but that the parties themselves interpreted the language of their contract as having the meaning that we have indicated. Clear evidence that they regarded excess outage as a matter which was dealt with by the contract is found in the fact that, upon learning that there was excess outage in 165 barrels of a 261 barrel lot of the spirits sold, defendant requested the broker to communicate this fact to the plaintiff so as to secure a waiver with regard thereto and that plaintiff agreed to go ahead with the purchase notwithstanding the outage in this lot. The fact that the plaintiff was willing to waive and did waive the outage on these 165 barrels is no evidence of willingness to make a similar waiver with respect to the entire purchase.

This interpretation of the contract accords, we think, not only with the usage and custom of the trade as established by

the evidence, with the reasonable meaning of the language used without regard to usage and custom and with the interpretation which the parties themselves placed upon the contract in their dealings with each other, but also with the inherent probabilities and the justice of the case. Plaintiff was buying the spirits for export and by negotiation succeeded in having the price reduced from $1 to 85¢ per gallon. For each gallon of excess outage the purchaser would have to pay more to the government than it was paying to the seller for 10½ gallons of spirits. It is not reasonable to suppose that the parties would have stipulated for a regauging of the spirits to determine the exact number of gallons for which 85¢ per gallon was to be paid and have paid no attention to the possibility of excess outage which would involve a liability of $9 per gallon. The reasonable assumption is that plaintiff was to pay for the spirits actually delivered, and that defendant would be responsible for the outage which had occurred while the spirits were in the possession of defendant and under its control.

That there has been a breach of the warranty that the loss by evaporation had been slight is clearly established. The evidence is that ordinarily the outage will not exceed that permitted by the "Carlyle formula" in more than three barrels out of a hundred, whereas in this case there was excess outage in 761 barrels out of the 971 remaining after the delivery of the 261 barrel lot and that the tax liability on this was $18,080.10, which was more than one-fourth of the total purchase price of the spirits purchased.

We have considered the additional defenses upon which defendant relies, to the effect that the taxes were paid by the Calvert Distilling Company and that plaintiff failed to mitigate damages, but in our opinion these are so lacking in merit as not to warrant discussion. For the reasons stated, the judgment appealed from will be reversed and the case will be remanded with direction to enter judgment for plaintiff for the sum demanded with costs.

Reversed and remanded with directions.